186 So. 349

**FALGOUT v. JOHNSON et al.**

**No. 35060.**

Jan. 10, 1939.

Rehearing Denied Feb. 6, 1939.

Charles J. Rivet, of New Orleans, for appellants.

Harvey Peltier, Guion & Schulze and Cobb & Saunders, all of New Orleans, for appellee.

HIGGINS, Justice.

Appellee filed a motion to dismiss the appeal on the ground that this Court is without jurisdiction ratione materiæ, alleging that the amount involved is less than $2,000, and the proceeding purely incidental to the execution of a judgment obtained in another case, and prays that we grant a rule to show cause why the appeal should not be dismissed.

The petition and answer herein show that both the plaintiff and the de-

fendants are claiming the ownership of the tract of land in question and that it is admitted to be worth in excess of $2,-000. The mere fact that one of the alleged links in plaintiff's alleged title to the land is a judgment in a lesion beyond moiety suit where the value of the property several years ago was fixed at $1,000, does not determine the value of the land at the time this suit was filed nor the nature of this action. The present proceeding is not a mere incident to the execution of the judgment of lesion beyond moiety but an action in which the plaintiff claims the ownership of the property, alleging that the defendants' alleged right thereto was predicated upon a forged instrument. As the main demand is for recognition of the plaintiff as owner of the property and for possession thereof, and since the property is admittedly worth in excess of $2,000, this Court has jurisdiction ratione materia. Ward v. Lynn, 149 La. 1048, 90 So. 399; American Well & Prospecting Co. v. Lillie Oil Co., 128 La. 660, 55 So. 8; Hardeman Co., Ltd., v. Caddo Concrete Const. Co. et al., 138 La. 107, 70 So. 53, and Stokes v. New Orleans Public Service, Inc., 173 La. 405, 406, 407, 137 So. 195.

In support of his contention that this Court is without jurisdiction, counsel for appellee has called our attention to the following authorities: Smith v. Merchants' Mutual Ins. Co., 33 La.Ann. 1071, Louisiana Western Lumber Co., Inc., v. Stanford, 178 La. 1052, 152 So. 755, and Lhote & Co. v. Church Extension Soc. of Methodist Episcopal Church et al., 115

La. 487, 39 So. 502. These authorities are not in point for the reason that the plaintiffs in those cases obtained judgments for amounts less than $2,000, and under writs of fieri facias seized property in excess of the value of $2,000, in order to satisfy their judgments. The Court uniformly held that the amount in dispute was the amount of the judgment and not the value of the seized property.

We, therefore, refuse to grant a rule nisi herein and overrule the motion to dismiss the appeal.

### On the Merits.

The plaintiff instituted this proceeding to be declared the owner of a certain tract of land, to have annulled a purported release of an option thereon on the ground of forgery, and to have the registration of the alleged instrument cancelled from the conveyance records. The defendants denied that the plaintiff's name had been forged and averred that his signature was genuine and that they were the owners of the property. The plaintiff asked for a trial by jury, which returned a verdict in his favor, as prayed for, and judgment was accordingly rendered. The defendants' application for a new trial was denied by the district judge and they have appealed.

It is conceded that the defendants bore the burden of proving by a preponderance of the evidence the genuineness of the disavowed signature. Watts v. Collier, 140 La. 99, 72 So. 822, Huddleston v. Coyle, 21 La.Ann. 148, and Succession of McDonogh, 18 La.Ann. 419.

█ It is also conceded, since only an issue of fact is involved, that the defendants, as appellants, must show that the verdict of the jury and the judgment of the trial court are manifestly erroneous, in order to justify their reversal. Hill v. De Soto Parish School Board, 177 La. 329, 148 So. 248; Ratcliff v. Levin, 175 La. 49, 143 So. 1; Mills v. Mills, 173 La. 795, 138 So. 671; Williams v. Dupuy, 184 La. 735, 167 So. 425.

The defendants' counsel contend that they have fully proved their case and discharged the burden imposed upon them by law, and counsel for the plaintiff argue that they have not done so.

The record shows that the late Thomas J. Johnson, owner of the property in controversy herein, and husband and father of the defendants respectively, entered into a contract of lease with the plaintiff, Horace Falgout, dated February 6, 1931, which contained a provision giving the lessee the right to purchase the property for the sum of $250. Horace Falgout borrowed $250 from his uncle, Leon Falgout, and exercised the option to purchase the property by depositing that sum of money in a bank, in accordance with the provisions of the ageement. Shortly after the lease was signed, Johnson died, and his widow and heirs refused to carry out the agreement, because they claimed that, due to Johnson's feeble and sick condition, Horace Falgout had imposed upon him. Horace Falgout then entered a suit against the widow and heirs for specific performance of the contract, and the defendants pleaded imposition and, in the

alternative, lesion beyond moiety. The case was tried on its merits and the district judge rendered a judgment rejecting the defendants' first defense, but sustained the plea of lesion beyond moiety, fixing the value of the property at $1,000 and giving Horace Falgout the option either to surrender the property upon the return of the $250, less certain credits, or to retain the property upon the payment of the additional sum of $750, with 5% interest from October 14, 1932, to date of settlement; and that if he failed to elect to retain the property by making the required payment, his claim to the title would be cancelled upon production of his receipt, showing the return of the money deposited, or in case he refused to accept the money, upon the deposit of the amount in the registry of the court, subject to his orders. The judgment was dated April 24, 1933, and condemned him to pay the cost of the suit. None of the parties appealed.

After the judgment became final, the attorney for the defendants, by telephone and letters, called upon the plaintiff's counsel to inform him what disposition their client intended to make of the matter. He was advised by the plaintiff's attorneys that they were unable to get their client to arrive at a decision and had some difficulty in getting him to come to their offices and they stated that they had no objection to the defendants' counsel approaching Falgout direct. The attorney drew a rule against Falgout to show cause why he should not elect to exercise the option granted him in the judgment and also prepared a release of the option in consideration of the return of the deposit.

He also withdrew from his account in the bank $250 cash for the purpose of making a legal tender to Falgout.

The defendants' attorney, Joseph O. Schwartz, and Thomas J. Moore, one of the defendant's sons, left New Orleans on May 16, 1933 by automobile and drove to Lockport, where they were joined by Harris J. Waguespack, a deputy sheriff, cattleman and trapper, who was interested in leasing the property, and they went to Gheens Store on Bayou Lafourche, where they met Horace Falgout, who operated a butcher shop there. Schwartz requested Falgout to make up his mind either to retain the property by paying the balance of the price fixed by the judge or release the property upon the return of the deposit. Falgout refused to give any answer to the question, stating he had not decided what to do. He was then asked if he had sufficient money to pay the balance, which would be due the defendants under the judgment if he retained the property, and he said that he did not. Schwartz, in the presence of Moore and Waguespack, counted out in cash a sum in excess of the amount due the plaintiff under the judgment and tendered it to him, but he declined to accept it. Schwartz then informed the plaintiff that he would be compelled to rule him into court to show cause why he should not elect to accept or surrender the property. The three men returned to the automobile, it being Schwartz's intention to go to the district courthouse at Thibodaux to file the rule; but upon Waguespack's suggestion that, in examining the title, he had learned that Leon Falgout had advanced the $250 to his nephew, Horace Falgout, for the purpose of making a deposit in the bank to exercise the option under the lease to purchase the property, and that it might be a good idea to consult Leon Falgout, the parties went to Leon's home. They arrived there about 11 o'clock in the morning and stated the purpose of their visit. Horace Falgout, apparently surmising where they were going, followed them in his own car and arrived at his uncle's home shortly after the three men got there. Leon Falgout invited the parties into the front room, where Schwartz told Leon Falgout that Horace Falgout would not give them a decided answer about exercising the option under the judgment, and that it was his intention, in order to bring the matter to a final termination, to file a proceeding in court to force him to elect. The written release was produced and the sum of $225 was then paid to Leon Falgout, who accepted the money and signed the release as a witness to the purported signature of Horace Falgout, Moore also signing as a witness to the signature. Waguespack remained in the automobile, Horace Falgout having previously expressed his unfriendly feeling toward him.

The evidence is conflicting as to what happened in the room, plaintiff's and his witness' version being that he told his uncle not to accept the money or sign the paper, the defendants' witnesses saying that Leon Falgout told Horace he did not want to have any more trouble with litigation and desired to be paid the money due him, whereupon Horace and Leon Falgout signed the release, after having had the matter fully explained and the entire document

read to them. Schwartz and his companions then left in the car and went to the courthouse at Thibodaux, where he filed the release in the record and had it registered in the conveyance office.

The defendants then rented the property to Harris Waguespack for trapping and grazing purposes, and he and his trappers took possession of the land. In 1935, Moore and Waguespack, together with other owners, erected a fence around the property and were not disturbed in their possession of it by the plaintiff. The defendants also paid all the taxes on the property.

On September 12, 1935, the defendants granted a mineral lease to Merry Bros. & Perini, Inc., on the property and caused it to be registered in the conveyance records in the Parish of Lafourche.

On October 13, 1937, Horace Falgout brought the present suit, claiming that his signature to the release of the property was a forgery.

On the trial of the case on the merits the plaintiff denied that he signed the document and stated "they signed my name" to it. He states that he never entered the room, but kept his hands on the frame of the door leading into the front room of his uncle's residence, where the parties were assembled, and that he told his uncle not to be a "damn fool" and accept any money or sign any papers; that due to the fact he was in an angry mood, because Schwartz had only offered him $200 at the time of the tender and wanted to beat him out of $50 of his deposit money, his aunt advised him not to get into an argument and to return that night to speak to his uncle; that he did return that night and discuss the matter with his uncle; that he did not know his name had been signed to the document until several years later, when he learned about it through rumors about the town, and went to the courthouse with one of his former attorneys, Edmond L. Deramee, and a friend, Camille Barrios, and after being shown the document, denied that he had signed it; that the defendants made him surrender possession of the property, but that he had grazed one cow on it and had gone on the property at different times without being ejected; and that he had signed the seventeen different documents, covering a period of many years, which were exhibited to him on cross-examination.

Mrs. Leon Falgout, the plaintiff's aunt, who looked upon him as a son, corroborated his testimony that he came into the residence by the back entrance after the other parties had assembled in the front room, and that during the entire time he was there, he had his hands upon the frame of the door leading into the front room; that she did not see him sign any papers; that she heard him advise his uncle not to accept any money or sign any papers and that he left upon her suggestion, returning that night to speak to his uncle about the matter.

Leon Falgout states that these strange men came to his home and told him the purpose of their visit, and he invited them into the living room of his residence; that they offered him money and he accepted,

because he was afraid if he did not do so, he would get in trouble; that he signed the document in question simply to give these strange parties a receipt for their money; that he did not see Horace Falgout sign the paper; and that his nephew left the house, returned that night and they discussed what had happened.

Camille Barrios and Edmond L. Deramee, one of the former attorneys for the plaintiff, corroborated Horace Falgout's statement that several years after the document was signed, they showed it to him at the courthouse and he denied his signature. Deramee further states that he had no recollection of Schwartz apprising him of the fact that Horace Falgout had signed the act of release and that Schwartz had forwarded the check for the sum of $78 for the delinquent taxes at that time and he was under the impression he had attended to the payment thereof.

W. S. Martin testified that the plaintiff had requested a loan from him for about $900 to take up the option on the land the day that the tender was made to Falgout by Schwartz.

Schwartz, Moore and Waguespack stated that while they were talking to Leon Falgout in his front yard, Horace Falgout came up and requested that his uncle speak to him privately before discussing the case with the other parties; that they retired at some distance away from them and when they returned, Leon said, in the presence of Horace, that he was tired of litigation and trouble and wanted his money; and that he then invited the parties into his residence in order to sign the necessary papers. Schwartz and Moore testified that while in the front room, the matter was fully explained to the Falgouts and the release read to them; that Schwartz told Horace as he had borrowed $250 from his uncle and granted him an interest in the property as security, he was paying the $225 to Leon Falgout for the account of Horace; that Horace then signed the release, which was witnessed by Leon Falgout and Moore; that they left and went directly to the courthouse at Thibodaux, where the paper was filed and registered in the conveyance records; that the property was then leased to Harris J. Waguespack for grazing and trapping purposes; that he took possession of it by placing cattle thereon and men to trap on the lands for him, and about 1935, the parties fenced in the entire property; that the plaintiff did not make any complaint that he was entitled to possession of the lands; that Moore has a ⅛th interest and Schwartz has a ¹⁄₁₂th interest in the property; and that the defendants paid all the taxes at all times on the property.

The two trappers, who possessed the land for the account of Waguespack, corroborated the defendants' witnesses' statements that Horace at no time attempted to disturb them in the possession and occupancy of the land.

Defendants also introduced in evidence seventeen documents, signed by the plaintiff, with reference to various subjects, covering a period of eighteen years, showing that the plaintiff signed his name seven times as "H. J. Falgout," seven times as "Horace J. Falgout" and seven times as

"Horace Falgout," the alleged forged signature being signed "H. J. Falgout." Three handwriting experts, Wheaton Stillson, New Orleans, Dr. Louis Schulhoffer, Birmingham, Alabama, and Elbridge W. Stein, New York, testified that they had examined the admitted signatures and the disputed one, and after careful study through magnifying glasses and enlargements thereof, were of the opinion that all of the signatures were by one and the same party and that the denied signature had no appearance of being forged, either by tracing or otherwise, it appearing that the characteristics in all of the signatures or writing were those of the same author.

In connection with the issue of lesion beyond moiety, Horace Falgout testified that the land in question had a maximum value of $500; Leon Falgout stated it was worth about $750, and the trial judge concluded from the evidence that the land had a value of about $1,000, and accordingly entered his judgment on April 24, 1933. From that date to May 16, 1933, it is conceded that nothing happened that would change the value of the property. It is, therefore, difficult to understand why Horace Falgout would be willing to pay the defendants a sum of money in excess of $900 for the land, in addition to the $250 deposited. This is particularly so for he testified that the first year he trapped on the land, he lost money, and the second year he only earned $48. Schwartz and his clients would have no motive in forging Horace Falgout's signature to the release, when between the date of the judgment and the date of the release, it is

conclusively shown that there was no increase in the value of the property.

Horace Falgout's lack of interest in the property after the date of the alleged release is reflected in the fact that he did not pay the taxes on the land, and the interest of the defendants in the land is shown by the fact that they did pay the taxes.

It is admitted that Horace Falgout returned to his uncle's residence on the night of May 16, 1933, the day the alleged release was executed, and talked to him about the controversy. Thereafter he did nothing, although he knew that his uncle had accepted the money and signed the paper, and by simply consulting his lawyer and the records in the court, he could have fully apprised himself of the status of the case. It is singular, at least, that he got his information about signing the release through rumors about town.

The denial of his signature in the presence of Barrios and Deramee comes at a suspicious time, because it appears that the property was then known to be valuable for prospective mineral purposes.

The question of who had possession of the property after May 16, 1933, was obviously material to the issue presented. The defendants, in their answer, allege that they had possession from that time and thereafter. The defendants proved that averment of the answer by several witnesses. The only countervailing evidence is the testimony of the plaintiff that he had a cow grazing on the land and had gone on it without molestation by the defendants. However, he first stated that

the defendants had denied him possession of the property. Surely, if he intended to make claim to the land, he would have insisted upon possession under the judgment of the court, granting him that right until the defendants reimbursed him the amount of $250 deposited, subject to certain deductions.

Furthermore, the plaintiff and his uncle, Leon Falgout, did not make any effort to return the $225 paid as a consideration for the release, and plaintiff, at the time of the trial, still owed, according to his own testimony, the $250 originally borrowed.

The members of this court have carefully examined the signatures of the plaintiff and compared them with the alleged forged one . and have reached the same conclusion as the three handwriting experts that they were all written by one and the same author and have none of the characteristics of a traced or forged signature.

At the time this suit was filed, it is conceded that the land in question had greatly increased in value due to the oil boom in that vicinity. This explains the plaintiff's motive for repudiating his signature.

It is apparent that Mr. and Mrs. Leon Falgout, because of their advanced ages and the time that elapsed between the signing of the document and the trial of this case, failed to remember what really transpired. In fact, a reading of their testimony shows that they only went so far as to say they did not see their nephew sign the instrument, but never stated that it was not his signature.

The discrepancy between the testimony of Deramee and Schwartz consisted of the fact that Deramee did not remember Schwartz telling him that Falgout had signed the release and Schwartz's statement that it was his recollection he had so informed him, "because he naturally would have done so," is easily understood. For instance, Deramee was of the opinion that he had paid the delinquent taxes with the check Schwartz had sent to him for that purpose and Schwartz was under the impression that he had gone to Deramee's office after securing the release of the property, received the check from him and paid the taxes himself.

██ It is our opinion that the verdict of the jury and the judgment of the trial court are manifestly erroneous and should be set aside.

For the reasons assigned, it is ordered, adjudged and decreed that the verdict of the jury and the judgment of the District Court are annulled and avoided, and that there now be judgment in favor of the defendants and against the plaintiff, Horace Falgout or Horace J. Falgout, rejecting his demands and dismissing his suit at his cost.