110 So.2d 142 (1959)
Luther PATTON, Plaintiff-Appellee,
v.
ARGONAUT UNDERWRITERS INSURANCE CO. et al., Defendants-Appellants.
No. 8929.
Court of Appeal of Louisiana, Second Circuit.
February 2, 1959.
Rehearing Denied April 3, 1959.
*143 Gold, Hall & Skye, Alexandria, for appellants.
John P. Godfrey, Many, for appellee.
AYRES, Judge.
This is an action for workmen's compensation. Plaintiff was engaged in cutting pulpwood with a power saw when he allegedly sustained accidental injuries on account of which he claims to be permanently and totally incapacitated for the performance of the same work or work of a similar character. Accordingly, he seeks to recover the statutory maximum compensation, less compensation previously paid, as well as medical expenses, from his employer, the employer's principal, and the principal's compensation insurer, all of whom were made defendants.
From a judgment in plaintiff's favor as prayed for, the principal contractor, Ed Jones, Jr., and his insurer, Argonaut Underwriters Insurance Company, have appealed. They earnestly insist plaintiff has not sustained the burden of proof resting upon him to show the continuance of disability beyond December 10, 1957, through which date compensation had been paid.
The accident occurred October 22, 1957. Plaintiff was working in the woods as a sawyer, using a power saw, felling trees and cutting them into pulpood. While so engaged he was struck on the head and upper portion of his body by the top of a tree falling upon him. He remained pinned down in the tree top for a considerable length of time when discovered by his son, also working in the woods, who procured the use of another saw from persons working nearby and cut the top and extricated his father.
It appears from the evidence that plaintiff was rendered unconscious for a period of approximately 45 minutes. After his removal from the tree top he was placed in a truck and taken to the clinic of Dr. Murdock in Zwolle, where he was received as a patient of Dr. Hubert L. Prevost. He was there hospitalized for a period of five days and was thereafter under the observation and treatment of Drs. Prevost and Murdock until December 21, 1957.
On November 1, 1957 at the request of the insurer, plaintiff was examined by Dr. Gene Caldwell, an orthopedist of Shreveport, Louisiana. A subsequent examination was made February 20, 1958, but Dr. Caldwell died prior to the trial of this case. The reports of his two examinations were incorporated in the record. In addition to Drs. Prevost, Murdock and Caldwell, Dr. Joseph Edelman, a neurosurgeon of Baton Rouge, Louisiana, examined plaintiff February 12, 1958.
On behalf of plaintiff, he was examined by Dr. V. C. Hatchette, an orthopedist of *144 Lake Charles, Louisiana, on December 3, 1957, Dr. Ed C. Simonton, likewise an orthopedist of Shreveport, Louisiana, on February 8, 1958, and on certain dates subsequent to trial, reports of which, by stipulation, were filed in evidence, and by Dr. H. K. Faludi, a neurosurgeon of Shreveport, Louisiana, on January 4, 1958.
During the period of plaintiff's hospitalization, X-rays were taken of the cervical, thoracic and lumbar vertebrae, and from their study Dr. Prevost concluded at the time there was possible a subluxation of the seventh cervical vertebra on the first thoracic vertebra. The Doctor's opinion at the time that plaintiff likely had some nerve root irritation was probably based on this finding.
Dr. Caldwell in his report of November 4, 1957, reported a positive finding of Roentgen evidence of muscle splinting of the lower cervical segments which he stated might denote a compression type injury with residual muscle spasm. The Doctor, however, was of the opinion that plaintiff's symptoms were largely subjective in nature and grossly exaggerated. He expressed an opinion of early recovery with adequate physiotherapy and anticipated no permanent residual disability. He found no positive objective evidence of any nerve root pressure or irritation.
Dr. Allie Woolfolk, a roentgenologist of Baton Rouge, Louisiana, who made X-rays of plaintiff for the use of Dr. Edelman, in a report thereon stated:
"There is a reversal of the normal lordosis curve in the upper cervical spine with alight anterior subluxation of C2 on C3. The subluxation is improved by attempting extension, but never corrected. * * *.
"There is slight narrowing of the C3-C4 interspace anteriorly, of uncertain duration, and associated with minimal hypertrophic marginal lipping of the vertebral bodies. Minimal lipping is also noted on some of the other cervical vertebrae, below that level, but without apparent narrowing of interspace."
In connection with this statement, an opinion was expressed that the narrowing of the aforesaid interspace was possibly associated with a disc injury of uncertain duration.
Dr. Simonton, in interpreting X-rays made for him of the cervical vertebrae, stated:
"Those films reveal a reversal of the normal cervical lordosis in the upper segment. That was marked at the intervertebral space between the second and third cervical vertebrae. The tupper facet of the third cervical vertebra was noted to be displaced and maintaining the position of deformity."
He later explained that when he used the word "displaced", he meant "dislocated". He also noted there was a slight spur formation generalized in the cervical region, and from his findings of facet dislocation, the narrowing of the vertebral interspace, and muscle spasm, he considered the possibility of a herniated disc.
Dr. Faludi found from the X-rays studied by him "a rather marked reversal of the usual curvature in the upper cervical region", indicating, in his opinion, severe muscle spasm. By his examination, an underlying high cervical disc was not definitely ruled out and he concluded that plaintiff suffered a severe cervical sprain, and recommended that plaintiff be placed in cervical traction and subsequently fitted with a neck collar. In the Doctor's report of February 18, 1958, he expressed an opinion that plaintiff was completely disabled for the type of work he had previously performed and recommended further treatment. The Doctor, however, testified that the narrowing between the third and fourth cervical vertebrae was significant.
Dr. Edelman, in a report of February 12, 1958, noted from the X-ray films there was *145 a slight subluxation anteriorly of cervical vertebra two on cervical vertebra three. No evidence was found by him of a fracture associated with the subluxation. He did note, however, a slight narrowing of the interspace between cervical vertebrae three and four which he later explained was within normal limits. He found no evidence of nerve root compression or of disc herniation and was of the opinion that plaintiff was exaggerating all of his complaints and, in reality, had no disability.
Dr. Simonton's primary diagnosis was that plaintiff's disability was due to a unilateral facet dislocation between the second and third cervical vertebrae and that the narrowing of the interspace between the third and fourth vertebrae was only secondary. Dr. Hatchette found but considered the narrowing of the interspace aforesaid was slight and within normal limits and found nothing to indicate a facet dislocation between the third and fourth cervical vertebrae, nor did he find any disc, lesion or dislocation.
Dr. Murdock was of the opinion at the time plaintiff was hospitalized that plaintiff was suffering from a contusion to the brachial plexis with sensory and motor nerve disturbances, reaching this conclusion by a process of elimination and finding that there had to be a contusion of the nerves to cause the symptoms of which plaintiff complained.
Dr. Hatchette, however, on his first examination found marked tenderness of the muscles, especially on the left side of plaintiff's neck, but also affecting the right side. X-rays made showed narrowing of the third a fourth cervical vertebrae but no evidence of fracture. He found it difficult to make a true evaluation of the condition of plaintiff's neck but was of the opinion that the injury received was sufficiently severe to cause a myositis of the cervical spinal region. The result of a subsequent examination of February 24, 1958, indicated to the Doctor that plaintiff was more severely injured than was discovered on the occasion of his first examination. He was unable to hold his head and neck in an erect position without evidencing considerable pain. Any motion of the cervical spine itself, stated Dr. Hatchette, caused plaintiff extreme pain, localized principally in the left side of his neck. The Doctor's conclusion was that on February 24, 1958, plaintiff was not improved over the condition in which he was found on a prior examination of December 3, 1957, but was much worse. He was, in the Doctor's opinion, unable to perform any type of work and was badly in need of treatment. This witness felt that plaintiff had some type of flexion injury to the cervical spine, with a tearing of the ligamentous and muscle structures, which was sufficient to produce the symptoms and pain of which he complained. Considerable muscle spasm was noted in the region of the left side of the cervical spine on attempting a movement of the neck in any direction.
Dr. Prevost testified that his initial opinion was that plaintiff suffered a contusion of the neck and shoulder, with a mild brachial plexis injury producing pain. Dr. Faludi was of the opinion, as was Dr. Simonton, that plaintiff had muscle spasms; that such spasms were involuntary, produced pain, and restricted motion. Nearly all of the doctors found rigidity and muscle spasm of plaintiff's neck or limitation of motion, and some of them found, as stated, evidence of nerve root involvement. Dr. Prevost expressed the opinion that plaintiff had received such a blow to his head or neck as to subluxate one of his vertebrae. He was so impressed with the seriousness of plaintiff's injury that he caused him to be hospitalized for a period of five days and treated thereafter as an out-patient for approximately six weeks.
Testifying with reference to a second examination, Dr. Hatchette expressed an opinion that the duration of plaintiff's disability was quite indefinite. Dr. Faludi's conclusion was that plaintiff appeared to be severely disabled, with most of his difficulties arising from the injuries to his neck, and that his pain was so acute that he *146 considered it part of the objective evidence of disability and was convinced of his disability, as was Dr. Simonton, who stated that plaintiff was totally disabled and would remain so until after receiving proper treatment over a period of months, possibly twelve to twenty-four months.
It will be observed, therefore, that the medical testimony is most conflicting but, primarily, the conflict is limited to the nature and duration of plaintiff's disability. He unquestionably received an injury to his neck. He complained of this injury so strongly he was outright classified as a malingerer by Dr. Caldwell and departed from the service of Drs. Murdock and Prevost apparently because of failure of cooperation. Drs. Edelman and Hatchette also observed exaggerated symptoms and postures. Nothwithstanding, the evidence is convincing and points up to the fact that plaintiff was still experiencing trouble and suffering pain in his neck on December 10, 1957, when compensation was discontinued, and on the date of trial, February 25, 1958. That a conflict exists between plaintiff's doctors as to the nature and cause of plaintiff's complaints is clearly noted from the testimony.
Obviously realizing the conflict in the medical testimony, plaintiff called at least seven lay witnesses to show that he held his head to the left and that his neck became and remained stiff following the accident. In contradiction of this, the defendants called an equal number of witnesses, who testified to the contrary on this point, as did Drs. Murdock and Prevost. Thus, the lay testimony is as much in hopeless conflict or evenly balanced as to whether plaintiff has feigned the position of his head, which he usually carried since the accident tilted to his left.
Circumstances tending to support plaintiff's position are that plaintiff, aged fifty-four years, has a wife and nine children to support and that prior to his accidental injuries he regularly earned from $60 to $110 per week from his work; that his reputation as a constant worker was good, as evidenced by the testimony of the witnesses of his community who had known him for many years; that during almost thirty years of employment in work of the same or similar character he had sustained only one slight physical injury and has never made any claim for or collected any compensation whatsoever.
Although, at least, four of the medical experts found it difficult to evaluate the extent, nature and duration of plaintiff's disability because of the abnormal position in which he carried his head and shoulder, their testimony conveys the impression they believe plaintiff was actually suffering from an injury. Drs. Caldwell, Murdock and Prevost thought the disability would clear up in a short period of time, although they expressed disgust with plaintiff because they could not properly evaluate his neck condition. Subsequent examinations by Dr. Hatchette caused him to re-evaluate his previous opinion and he then concluded that plaintiff had a serious neck injury.
Moreover, the trial judge, who was certainly in a position to determine better than any one else, evaluated the conflicting testimony and resolved the issues in plaintiff's favor. The conclusion reached by the trial court, as evidenced by the judgment in plaintiff's favor, is that plaintiff was not simulating the injuries to his neck. We concur in his conclusions and, from a careful consideration of all the evidence in the record, we are convinced plaintiff was totally and permanently disabled on the date of trial from accidental injuries received by him in the course of his employment.
Plaintiff's condition is conclusively attributable to the accident. We believe he is a subject for compensation. As was stated in Johnson v. Atlantic & Gulf Stevedores, Inc., La.App., 102 So.2d 518, 520:
"The mere fact that a compensation claimant is unable to specifically identify or indicate the type of injury he has sustained does not preclude a recovery *147 of compensation. The test is disability vel non and not the nature of the injury. Wallace v. Spohrer-Pollard Contractors, La.App., 76 So.2d 312; Dixon v. T. J. Moss Tie Co., La.App., 70 So.2d 763; Brown v. Joseph Rathbone Lumber Co., 11 La.App. 599, 123 So. 383."
See also Phillips v. Yazoo & M. V. R. Co., La.App., 183 So. 43; Lowery v. W. Horace Williams Co., La.App., 8 So.2d 704.
In the Phillips case, this court stated:
"We are of the opinion that it is immaterial to a decision of the case whether plaintiff can prove the exact specific injury or not. If he shows that his back was injured, the location of the injury and that the injury still exists to such a degree that he is unable to perform ordinary manual labor, he has made out his case. * * *. If plaintiff had to prove with specificness the exact part of his back that was injured, he would be left to the mercy of the medical profession which never fails to disagree as to the injury of a back." [183 So.2d 46].
In the Lowery case, the Court of Appeal for the First Circuit observed:
"True it is that the doctors do not agree on what the specific nature of the back injury is, but this, it seems, is not unusual in cases of this kind. See Phillips v. Yazoo & M. V. R. R. Co., La.App., 183 So. 43. If there is found to be an accidental back injury which brought on the disability, the fact that the injured employee cannot have the doctors agree on its exact cause cannot deprive him of the compensation which is otherwise due him under the compensation statute, Act 20 of 1914 and its amendments." [8 So.2d 705].
It is the firmly established jurisprudence that the findings of a trial court upon questions of fact are entitled to great weight, and that when only issues of fact are involved, such as were the issues in the instant case, it is incumbent upon the appellants, in order to secure a reversal of the decision from which they appeal, to show manifest error in the judgment. Thornton v. Ellington, 209 La. 613, 25 So.2d 282; Falgout v. Johnson, 191 La. 823, 186 So. 349; Lejeune v. Lejeune, 187 La. 339, 174 So. 643; Wagner v. Shannon, 180 La. 233, 156 So. 289; Kruse v. Kruse, 175 La. 206, 143 So. 50; Guillory v. Fontenot, 170 La. 345, 127 So. 746; Currie v. Government Employees Ins. Co., La.App., 90 So.2d 482; Commercial Credit Corp. v. Morris, La. App., 107 So.2d 563.
Not only do we fail to find manifest error in the judgment appealed, but we conclude that the evidence preponderates in plaintiff's favor and that, accordingly, the judgment appealed should be and it is hereby affirmed at appellants' cost.
Affirmed.