CHASEZ, Judge.
This action arises out of a truck-bus collision which occurred approximately 20 to *256 30 feet off U. S. Highway 90 between the Chef Menteur and Rigolets bridges. August F. Friedel, Sr., was operating a pickup truck in a direction away from New Orleans and as he rounded a curve in the highway, was confronted with a large bus owned by Bayou Tours, Inc., in the Friedel lane of traffic in the act of passing another inbound pick-up truck. Apparently, Friedel swerved to his right and off the highway in an endeavor to avoid a head-on collision, but the bus driver simultaneously swerved left off the highway and the bus and the Friedel pick-up truck collided. August F. Friedel, Sr., was killed.
Mrs. Theresa Bohlender, widow of August F. Friedel, Sr., filed suit to recover damages for the wrongful death of her husband in this accident against Bayou Tours, Inc., and their insurer, Marquette Casualty Company, as defendants. In answer to the suit, • however, the defendants impleaded by third party action T. Smith and Son, Inc., the owner of the pick-up truck that the bus was passing. Thereafter, the original plaintiff amended her petition to include, as an additional defendant, T. Smith and Son, Inc.
The American Mutual Liability Insurance Company, the workmen’s compensation carrier of the employer of the decedent, August F. Friedel, Sr., intervened seeking reimbursement for funeral expenses and compensation benefits they expended out of any judgment plaintiff might recover, in accordance with the Workmen’s Compensation Law.
The Allied American Mutual Fire Insurance Company and Richards Center, Inc., filed suit against the defendant, Bayou Tours, Inc., and Marquette Casualty Company, seeking to recover the value of the truck owned by Richards Center, Inc., and insured by Allied American Mutual Fire Insurance Company, which August F. Friedel, Sr., was driving at the time of the accident.
The case was tried before a jury and the verdict of the jurjr was in favor of plaintiff and against Bayou Tours, Inc., and Marquette Casualty Company. This verdict reads as follows:
“We the jury find a verdict for the plaintiff, Mrs. Theresa Bohlender, widow of August F. Friedel, Sr., and against the defendants, Bayou Tours, Inc., and Marquette Casualty Company, in solido, in the full sum of $85,000.00 together with legal interest from date of judicial demand until paid, and all costs of these proceedings and further find a verdict for T. Smith & Son, Inc. and against plaintiff dismissing her suit against T. Smith & Son, Inc. at her cost.
“December 7th 1961
Harold S. Guhan
Foreman”
The district judge, on the same day, entered judgment in the record in favor of the plaintiff and against the defendants, Bayou Tours, Inc., and Marquette Casualty Company, and in favor of T. Smith and Son, Inc., and against the plaintiff, Mrs. Theresa Bohlender, widow of August F. Friedel, Sr., dismissing plaintiff’s, demand against T. Smith and Son, Inc., all in accordance with the verdict of the jury.
The judgment of the court further decreed that Mrs. Theresa Bohlender, widow of August F. Friedel, Sr., was to pay to the American Mutual Liability Insurance Company the sum of $2,875.00, out of the money recovered by her from the defendants, Bayou Tours, Inc., and Marquette Casualty Company, all as per stipulation of the parties entered into the record. The court further fixed the fees of the experts as follows:
Dr. Nicholas Chetta $150.00
Dr. Keith Reemtsma 150.00
Dr. Homer Dupuy 250.00
Dr. W. E. Groves 250.00
which expert fees are to be paid by the defendants jointly and in solido.
*257 On November 10, 1961, the court rendered judgment, after the trial of the exceptions, of no cause and no right of action, in favor of the third party defendant, T. Smith and Son, Inc., and against the defendants and third party plaintiffs, Bayou Tours, Inc., and Marquette Casualty Company, dismissing said third party plaintiffs’ suit. The court rendered judgment in favor of Allied American Mutual Fire Insurance Company and against the defendants, Bayou Tours, Inc., and Marquette Casualty Company for the sum of $635.00, together with legal interest from date of judicial demand and all costs; and a judgment in favor of Richards Center, Inc., and against the said defendants, jointly and in solido, for the sum of $50.00, together with interest from judicial demand and all costs.
It is from these judgments that the defendants, Bayou Tours, Inc., and Marquette Casualty Company have appealed suspen-sively. Plaintiff, Mrs. Theresa Bohlender, widow of August F. Friedel, Sr., appealed from the portion of the judgment dismissing her suit against T. Smith and Son, Inc.
This record, through its nearly 700 pages of real and testimonial evidence, indicates by a preponderance of the evidence that August F. Friedel, Sr., met his death as a result of the grossly negligent driving of Burton Blancher, the bus driver for Bayou Tours, Inc. Not one witness of the many called proved August F. Friedel, Sr., guilty of any negligence which contributed to this accident. This record, likewise, discloses that the driver of the truck owned by T. Smith and Son, Inc., was also free of any negligence contributing toward this accident.
While the defendants charge the decedent, August F. Friedel, Sr., with contributory negligence and urge this defense somewhat in the brief filed with the court, in truth and in fact a fair appraisal of the evidence convinces the court that the defendants mainly endeavored to secure a judgment against T. Smith and Son, Inc., whose negligence they urge forced Blancher into an untenable predicament and said T. Smith and Son, Inc., were at least liable, in solido, for the consequences thereof.
Proceeding outbound from the City of New Orleans and to the right of the Chef Highway is an old abandoned road commonly referred to as the “Old Dump Road.” This road approaches the main highway on an angle. Proceeding inbound toward the City of New Orleans the highway is divided by a series of yellow lines, both double and single, which prohibit passing by inbound traffic. These lines begin shortly past the Old Dump Road and continue uninterrupted well past the point of impact. The pick-up truck of T. Smith and Son, Inc., entered the highway from the Old Dump Road proceeding on its way to New Orleans. Some distance to the right of the truck, going on the highway toward New Orleans was the bus of Bayou Tours, Inc., operated by Burton Blancher. In the evidence the distance between the truck of T. Smith and Son, Inc., and the bus varies from two blocks to a half mile; however, be that as it may, the truck of T. Smith and Son, Inc., operated by Louis Porter, Jr., its driver, an employee of T. Smith and Son, Inc., proceeded across the highway and turned in the correct lane to proceed to New Orleans. Blancher states that he followed the truck but found that because of its abrupt entrance into the highway that he had to attempt to pass it, although the evidence shows that he drove the bus for at least three hundred feet before he caught up to it in his attempt to pass it. In the meantime, August F. Friedel, Sr., on his way to Pass Christian, Mississippi, from New Orleans was approaching the curve in the highway where this tragedy occurred. While driving in the curve where he had the protection of the usual single and double lines which indicated that oncoming traffic in his lane was prohibited, he was confronted with the large Bayou Tours, Inc., bus traveling over 50 miles per hour bearing down on him. When the space between the red truck and the bus diminished to approximately 300 feet, which made a head- *258 on collision imminent in not more than three seconds, Friedel was constrained to go off the highway to his right and at about the same time, Blancher went off the highway to his left. The collision then occurred and Mr. Friedel was killed.
The following evidence indicates that this accident happened solely through the negligence of Burton Blancher. Police Officer Grandeury, in testifying to what Burton Blancher stated to him regarding the accident, said:
“Q. Do you understand the question, Officer?
“A. Yes, sir.
“Q. You may proceed to answer it.
“A. I questioned Burton Blancher with regard to how this accident happened. He stated to me he was traveling inbound in the direction of New Orleans, and as he passed a road which he estimated a dump road, approximately 1000 feet from — ”
* * * * * *
“A. He related to me that a pickup truck had come out of the dump road which he pointed to, which was approximately one thousand feet, to his estimation; and as he approached the rear of this truck, he went into the opposite lane to pass, and in doing so, reaching adjacent to the mentioned pickup truck, he noticed a car traveling from the opposite direction. In an attempt to avoid a collision, he cut to the river shoulder of the road. I asked Blancher as to what speed he was traveling; he stated approximately fifty-five to sixty miles per hour. I also at the scene pointed out to Blancher the prohibiting lines which is not permissible to pass.” (Test. Vol.
2, p. 105-106)
******
“Q. Did you speak to Burton Blancher ?
“A. Yes, sir.
“Q. Did he admit to you that at the time he attempted to pass the T. Smith truck he knew he was in a no-passing zone?
“A. In my interrogation, yes.
“Q. He did admit it to you?
“A. That’s right.
“Q. He admitted that he had full knowledge that he was in a no-passing zone ?
“A. No, I informed him first of the prohibitive passing. He was aware of it, to his answer to me.
“Q. He indicated he was aware of it?
“A. Yes, sir.
“Q. Can you point to the spot on either your chart or mine where Blancher indicated he had come out to pass the T. Smith truck? If you’re more familiar with your chart, feel free to use it, or if you can transpose to her, take your picture.
“A. Repeat that question again, please.
“Q. Where did he tell you that he pulled out to pass the T. Smith truck ?
“A. About two hundred yards beyond that dump road there.
“Q. Beyond it?
“A. (Witness nods head affirmatively.)
“Q. That is six hundred feet past the dump road?
“A. Right. Two hundred feet. I couldn’t establish no direct path back at that point.
*259 “Q. Furthermore, do you know of your own knowledge where this bus attempted to pass the truck?
“A. At what point, no, sir.
“Q. And all of your information obtained on the chart is obtained from one source only, and that is Burton Blancher?
“A. Yes, sir.” (Testimony, Vol. 2, pp. 132, 133.)
Another officer who assisted in the investigation, Poche, was called and his testimony can be summarized thusly:
“Q. Officer Poche, you have related to us that you have interviewed Burton Blancher, who is now present in the court. You have already identified him?
“A. Yes, sir.
“Q. And you were told two different stories as to how this accident happened?
"A. That’s correct, sir.
“Q. What was the time lapse between the first relation by Blancher to you of how it happened and the second ?
“A. About an hour and fifteen, hour and twenty minutes.
“Q. And am I not correct in stating that it was the first relation to you of how it happened where there was only telling you that the T. Smith occupants might be witnesses?
“A. That’s correct, sir.
“Q. And it was sometime later that he then attempted to involve the T. Smith people more directly?
“A. That’s correct, sir.
‘‘Q. Is it a fact that he stated to you that before passing the T. Smith truck he knew he was already in a no-passing zone?
“A. Yes, sir, he stated he knew he was passing on a double yellow line.
“Q. And did he tell you the reason he did this was because he thought he could get around?
“A. Yes, sir, on his first statement, that’s correct.
“Q. I’m referring to his first statement.
“A. That’s correct
“Q. And he stated that he was going between fifty-five and sixty miles per hour?
“A. That’s correct, he stated he knew he was exceeding the speed limit, but it was wide open.
“Q. He even knew he was going too fast?
“A. That’s correct.” (Testimony, Vol. 2, pp. 189, 190.)
******
“A. No, sir, he mentioned nothing about the T. Smith coming out the dump road. His statement was that this truck was traveling slower than he was, and it appeared that the lane was clear, and he went around this truck to pass him, and suddenly the other truck appeared in front of him.
"Q. But did he say that he passed at the point of the dump road?
“A. No, sir, not at the point of the dump road, no, sir. He indicated a spot further down from the dump road.
“Q. How far from the dump road?
“A. Well, to use his words, a thous- and feet.
“Q. In other words, he stated to you that he attempted to pass the T. Smith truck a thousand feet closer to New Orleans than the in *260 tersection of the dump road, is that correct?
“A. That’s correct.
“Q. And that it was not until he was thousand feet pass the dump road that he turned out and went into the lane of traffic for going across the lake?
“A. That was his estimated thousand feet, was the time that he pointed out a spot where he showed us that he started to pull around the truck and I asked him how far would he say this was from this particular road to get a realization of his distance. He stated it was about a thousand feet from where he pointed out to the dump road, in his estimation.” (Testimony, Vol. 2, pp. 195, 196.)
Mr. Thomas G. Flood, a witness summoned by appellee, T. Smith and Sons, Inc., but called as plaintiff’s witness, was the only truly independent and direct eye-witness to the occurrence. He testified that he was occupying an automobile moving outbound from New Orleans behind August Friedel, going toward Pass Christian, and when asked to describe how the accident occurred stated:
“Q. Now, as briefly as you can, will you tell us what you saw.
“A. Well, Mr. Lefevre and I, we reentered the car after we checked this fishing camp over, and he began to pull out on the highway, and I stopped and told him, ‘Look, when you get to make an entry on a main highway you want to get rolling on the shoulder, because these cars come pretty fast along here, so you can pick up speed along the shoulder of the road if it’s possible and then pull out when you get clearance’; and before we got to enter the paved part of the highway he looked through his rearview mirror and said, ‘Well, there’s a small red truck coming.’ I said, ‘Well, let him pass, we got time, we got all day to do it in.’ We were going to get a list on a piece of property further up, about a mile beyond where we had examined this fishing camp. Well, as the truck passed us, he drove onto the pavement and we began to pick up speed. Well, I’d say the truck was between three hundred feet ahead of us by the time we were rolling, about thirty-five miles an hour. I’d say the truck was going between forty and forty-five. We had entered the curve along this highway, and I noticed a green red-or rather a green pickup truck coming toward New Orleans, and in the back of that green pickup truck there was a bus. At that distance it looked like a Continental Trailways bus, but later on I learned that it wasn’t; and I noticed that the bus pulled out on the lefthand side of the road going west, and I mentioned to Mr. Lefevre, I said, ‘Get a load of this, here’s a truck trying to pass a pickup truck on the highway on the wrong side of the road, and a curve marked with yellow .lines.’ Well, as the bus pulled alongside of that green truck, the men in the red truck must have noticed that his path driving eastward was blocked, so he began to go to the shoulder of the road; and as he got on the shoulder, this bus cut right across onto the shoulder of the road, and they collided.” (Testimony, Vol. 2, pp. 205, 206, 207.)
Mr. Flood further detailed the occurrence of the accident under cross-examination thusly:
*261 Mr. Flood, when you first looked and noticed the oncoming green truck, the bus was behind it? a
The bus was behind the green truck.
Following it? a
That’s right. <
Were they proceeding at about the same speed, as far as you could tell? a
Well, he had to he following the bus to have a normal speed, or he was checking his speed.
Where was the green truck in relation to the curve in which this accident happened when the bus pulled out to pass it? a
Well, the green truck was driving on the righthand lane. There’s only two lanes in that curve, you understand. He was on the right side of the road, and the bus pulled out on the lefthand side of the road.
And what was in the curve? ©
That was in the curve. >
They were already in the curve when the bus tried to pass the green truck? ©
That’s right. >
When the bus tried to pass the green truck, was Mr. Friedel’s truck also in the curve from the opposite direction ? ©
Oh, yes, Mr. Friedel was about three hundred feet ahead of us, I’d say between three and four hundred feet ahead of us.
And how far were the front of the bus and the front of the Fried-el truck to each other in that curve? If you don’t know— a
I noticed one thing, that the truck —that the bus had pulled into that > lane to pass the green truck, and I knew that the red truck was going toward Pass Christain, you understand. Whether the driver of that bus saw the green truck, the red truck, or not, I don’t know; but I do know that the red truck evidently saw the bus in his path, and he went to the side of the road.
“Q. How long had the red truck left the road before the bus attempted to get off the road also ?
“A. Well, I’d say that the little red truck traveled a distance of about sixty feet before he crashed into that bus.
"Q. And that sixty feet was traveled while the truck was off the road?
“A. Well, the little red truck was off the road, and he was going by when the bus whipped across and caught him right on the edge of that shoulder.
“Q. I see. How long was the bus alongside the green pickup truck that it was trying to pass ?
“A. Well, I’d say a couple of seconds, ' three seconds at the most.
“Q. A very short time?
“A. That’s right.
“Q. And it was from that position—
“A. Running along together, see.
“Q. It was in that position that it pulled off to the left, it was while it was out there next to it that it pulled off to the left ?
“A. Well, I saw the bus running alongside the truck, you understand, trying to pass him. I’d say it was about three seconds, and I noticed the little red truck head to the side of the road.
“Q. And it was right after that that the bus did also?
*262 “A. It was right after that that they both collided.” (Testimony, Vol. 2, pp. 207, 208, 209,210.)
^ ‡ * ‡ ♦
In Louis Porter’s own words, the accident was described as follows:
“Q. Did you at any time see a bus that a Bayou Tours bus on that highway after you entered the highway?
“A. I saw it, I didn’t know — when I saw the bus I didn’t know whether it was Bayou Tours or not, but I saw the top of the bus before I entered the highway, I saw ■ the top of the bus.
“Q. And where was it at the time?
“A. I’d say it was about five blocks away from me at the time.
“Q. And in what direction was it — >
“A. It was headed toward town, too.
“Q. And when you entered the highway, was it to the right of your green truck as you' entered the highway and saw the top' about five blocks away; was that to the right of your truck?
“A. Yes, sir. I pulled to the road, stopped, I looked down the highway toward the Rigolets, I saw the top of the bus.
“Q. And that bus was traveling on the same part of the highway that you expected to travel on, was it ?
“A. Yes, sir.
“Q. Now, did you finally drive over onto that portion of the highway ?
“A. Yes, sir, I came right out on the highway.
“Q. Then your were headed for the Chef bridge?:
“A. Yes, sir.
And you were then on the right-hand side of the highway going in, weren’t you ? a
Yes, sir. >
Now, when you finally got on that part of the highway, did you again see the bus ? ©
I saw the bus in the mirror on the side of my truck when it pulled up behind me. >
How far had you traveled from the time that you entered the right lane of that highway going in, to the time that you saw the bus right behind you? ©
Well, I traveled about, I’d say, about two blocks on the highway. >
As the bus came up behind you, you saw it in the mirror, did you ? a
Yes, sir.
Did it sound a horn ?
No, sir.
Did you then just keep going along ?
I kept going along, yes sir. c
About how fast were you going? a
Between thirty-five, forty miles an hour. c
While you were traveling along at that rate, did the bus stay behind you all the time? a
The bus caught up to me, and then pulled out to pass me. >
Did you see any lines on the highway? a
Yes, sir. >
At that point, what kind of lines did you see? ©
It’s a red line on the highway. >
Red line? ©
*263 “A. Red line — yellow line, I mean, the line running along the highway.
“Q. A yellow line; you not color blind are you?
“A. No, sir, I’m not color blind.
“Q. You saw a yellow line; was that a double yellow line or just a single yellow line?
“A. One part of it was a single line, but where the passing was it was double.
“Q. You say where the passing was; you mean at the point where the bus tried to pass you, you were running alongside of a double yellow line, is that what you mean?
“A. Yes, sir.” (Testimony, Vol. 2, pp. 263, 264, 265.)
* * sfc * s|e *
“Q. Now, when you first saw that bus, you have shown on the picture where it was and that is at point 2, will you tell us how far away you think it was?
“A. I’d say it was about 5 blocks away from me.
“Q. About 5 blocks from where you were?
“A. Yes, sir.
"Q. Now, what did you do after you saw that bus?
“A. I pulled onto the road.
“Q. When did you next see the bus ?
“A. When the bus came up behind me.
“Q. And at that time, what part of the bus did you see?
“A. I could see all of it.
“Q. How did you see it?
"A. I saw it through the mirror on the side of my truck.
I think that you testified at that time you had gone about two blocks and had attained a speed of about 35 to 40 miles an hour? ' ¡Ó
A. Yes, sir, I’d say that was the speed I was between 35 and 40 miles an hour.
"Q. And you had traveled about 2 blocks from point 1 as shown on this picture?
“A. I’d say about that far, yes.” (Testimony, Vol. 3, p. 150.)
A passenger in the T. Smith and Sons, Inc., vehicle confirmed Louis Porter’s testimony, when he testified:
"Q. Now, Louis, when you re-entered the highway, did the truck you were driving in stop before entering the highway.
“A. Completely stopped.
“Q. You are sure of that?
“A. Yes.
“Q. How long was it stopped ?
“A. Oh, I’d say about- — -about a minute or so, maybe.
“Q. Did you see any traffic come from either direction when the truck went on the highway?
“A. I didn’t.
“Q. Did you look carefully ?
“A. I looked around and I didn’t pay too much attention.
“Q. You weren’t driving?
“A. I wasn’t.
“Q. You weren’t conscious of any traffic coming from either direction?
“A. Right.” (Testimony, Vol. 3, p. 175).
******
*264 "Q. That is before it went around. How far away from you was it when you first saw it?
“‘A. About S blocks, I guess.
■“Q. What was the bus doing when you first saw it?
“A. Coming on up behind the truck.
“Q. Did the bus ever get up to the truck ?
"A. About 25 feet from the back of it.
“Q. How long was it in that position ?■
“A. No time.
“Q. What did it do when it reached that position?
“A. Went out, drived up the side the cab and left the highway.
“Q. When it pulled out, you mean it pulled out into the oncoming lane of traffic?
“A. Yes.
"Q. When it did that, were you on a straightaway or on a curve?
"A. A curve.
“Q. How long was that bus alongside the truck you were riding in ?
“A. No time.
“Q. Did the front of the bus ever get as far forward as the front of the truck you were in?
“A. No, never got no further than the end of the cab right where the door shuts.” (Testimony, Vol. 3, p. 177.)
* *****
“A. When I first saw the bus, when we got on the highway, it was about 5 blocks back, you understand.
“Q. Five blocks back?
“A. Between — you talking about the bus that caught up with us?
“Q. If you will answer me: Where was the bus when you first saw it? Now, is your answer that it was 5 blocks behind you when you first saw it?
“A. Right.
“Q. The bus then had come out of this curve towards the Rigolets when you first saw it ?
“A. Yes.
“Q. It was on the straightaway behind you, in other words, when you first saw it?
“A. Yes.
“Q. And it was 5 blocks behind you ?
“A. (Nods head affirmatively.)
“Q. What side of the road was it on ?
“A. When it was following the truck, it was on the righthand side coming to town.
“Q. Now, how far did your truck travel before the bus caught up with it?
“A. About 3 blocks, I guess.
“Q. And when it caught up with it, what did it do?
“A. It come on the side — come from behind the truck, run on the side and run off the highway.” (Testimony, Vol. 3, p. 206.)
Charles Surle, another occupant of the T. Smith and Sons, Inc. pick-up truck, confirmed the earlier testimony of the driver, stating:
“Q. After stopping and seeing the bus some 5 blocks away, what did Louis then do?
“A. Went across and made a U-turn and continued to New Orleans. After we went about 3 blocks, I didn’t watch or look in the back any more. The bus pulled just *265 where the front doors were. As fast as he pulled up, he went off the highway and there was the truck coming.
“Q. Before you noticed the truck alongside of you to the left, did you hear any horn-blowing ?
“A. No, no horn.
“Q. Again, referring you to this diagram, Mr. Surle, do you know approximately where the accident happened ?
“A. No, not by the map, but measurements, I’d say about 3 blocks.
“Q. Three blocks from where you entered the highway ?
“A. From where we came out the road, about 3 blocks further.” (Testimony, Vol. 3, pp. 227, 228.)
Another police officer, St. Clair, under cross-examination by counsel for Bayou Tours, Inc., was also corroborative of the facts as reflected by all other witnesses, stating:
“Q. Did Louis Porter, in his statement to you at that time, refer to having been on any road other that U. S. 90?
“A. Yes, sir, he was on a shell road or a dump road.
“Q. Now, will you tell us what Louis Porter stated to you in connection with his movements on the dump road that you referred to?-
“A. He told me — I asked him when he approached the highway how far away was the bus when he first noticed it, and he told me it was between 4 and S blocks away at the end of the road, and he went on to the highway and he was proceeding down the highway and . had gone between 2 to 4 blocks when the bus caught up with him.
“Q. Now, do you recall whether in his statement at that time he referred to a bus, a curve in the road in connection with the bus ?
“A. I believe that in the beginning that as he approached the highway he said that the bus was in the curve 4 to 5 blocks away from him.” (Testimony, Vol. 4, .p. 339.)
Burton Blancher in part testified as follows:
“Q. You were present in Court, were you not, when Officer Grand-berry testified?
“A. I was.
“Q. Did you hear him state that you admitted the speed of 55, 60 miles an hour?
“A. I heard him say that I said that,
“Q. Was he lying?
“A. I wouldn’t say that the officer was lying. I would say he would be mistaken.
“Q. Were you present when Officer Poche testified?
“A. I was.
“Q. Did you hear him state that you were speeding 50, 60 miles an hour ? Did you hear him say that ?
“A. Yes.
“Q. Was he lying?
“A. I don’t say he was lying. I would say that he was mistaken.
“Q. Were you here when Louis Porter testified ?
“A. I was.
“Q. Did you hear him, state that you were several blocks behind him when he entered the road and you later caught him?
*266 “A. Idid.
“Q. Is he lying?
“A. That is the truth that I was down the highway when they first began to come out of the road.
“Q. How far behind them were you when they came out of the road?
“A. I stated anywhere between one and a half to three blocks. At that time, the distance was unimportant to me. I had the right-of-way.
“Q. You were as much as three blocks behind them when they entered the road, when they entered the highway ?
“A. When they came out of the dump road and hesitated by the- highway, I was one and a half to three blocks back.
“Q. Did you hear Louis Porter say that you were several blocks behind him when he entered the road and that you later caught him and tried to pass him in the curve ?
“A. I heard him say that.
“Q. Is he lying?
“A. I wouldn’t say that he was lying, I—
“Q. Thank you.
******
“The Court:
“Proceed:
“Q. Were you in Court when Charles Surle testified in this trial yesterday?
“A. I was.
“Q. Did you hear him state that you were several blocks away when Porter entered the highway and that you caught them and then attempted to pass in tlie curve?
“A. I did.
“Q. Was he lying?
“A. I have heard the testimony in two different places; both times it has differed.
“Q. That is not a response to my question. You were asked a direct question, will you answer it?
“A. I can’t say whether the man was lying; he could have been mistaken. I won’t say that the man was lying.
“Q. Were you in Court when Adam Lewis testified yesterday.?
“A. Yes.
“Q. Did you hear him state that he watched you come closer from five blocks back until you caught them?
“A. Yes.
“Q. Was he lying?
“A. I wouldn’t say he was lying; mistaken.
“Q. Were you in Court when Thomas Flood testified?
“A. I was.
“Q. Did you hear him state that he saw your bus following the T. Smith truck in the curve and that you suddenly attempted to pass in the curve?
“A. I heard him say that.
“Q. Was he lying?
“A. Once again, he was mistaken.
“Q. Could we understand then from such testimony that they were either lying or mistaken as to what they saw and heard, and only you, what you saw and heard, are telling the truth ? Can we assume that?”
*267 From the testimony above summarized, from all of the exhibits including photographs and original policy sketches, as well as from the delineations by all witnesses on the engineering drawing appended thereto, the Court and the jury were well able to make a factual determination in this cause and from this evidence were compelled to disbelieve Burton Blancher for the evidence not only preponderates in favor of defendant, T. Smith and Son, Inc., but virtually creates a factual situation beyond a shadow of a doubt favorable to said defendant.
In Currie v. Government Employees Insurance Company, 90 So.2d 482, the Second Circuit Court of Appeal recently pronounced against what has been the law of Louisiana from time immemorial, relative to factual determination, when the Court stated:
“Only questions of fact are herein involved. We have repeatedly held that the findings of the jury and of the trial judge upon questions of fact are entitled to great weight and accordingly when only issues of fact are involved, it is incumbent upon the appellants, the defendants herein, in order to secure a reversal of the decision from which they have appealed, to show that the judgment complained of is manifestly erroneous, and this they have failed to do. Guillory v. Fontenot, 1930, 170 La. 345, 127 So. 746; Kruse v. Kruse, 1932, 175 La. 206, 143 So. 50; Wagner v. Shannon, 1934, 180 La. 233, 156 So. 289; Lejeune v. Lejeune, 1937, 187 La. 339, 174 So. 643; Falgout v. Johnson, 1939, 191 La. 823, 186 So. 349; Thornton v. Ellington, 1946, 209 La. 613 [614], 25 So.2d 282.”
See also: Thornton v. Ellington, 209 La. 613, 25 So.2d 282, Belcher v. Booth, 164 La. 514, 114 So. 116.
The law supports the findings of the Court and the jury and concurs wholeheartedly with them in condemning the acts of Burton Blancher. In Hardaway v. Hilburn, La.App., 34 So.2d 283, the Court said t
“The highway act makes the wholesome-requirement that the drivers of vehicles-proceeding in opposite directions shall! each yield at least one-half the main traveled portion of the road for a distance of 200 feet before meeting. In order not to risk violating this rule, it is incumbent upon the driver negotiating a curve, where he cannot see the road for 200 feet ahead due to obstructions, to keep on his own side of the road. A motorist entering a blind curve has no right to ‘take a chance’ that he will not meet an oncoming car. When a driver, as did the defendant in this case, comes around a curve on the wrong side of the road, he is responsible for the damages occasioned by his negligence.”
A case similar in facts to the question presently before this Honorable Court was decided by the First Circuit Court of Appeal in 1954, Woodward, Wight & Co., Ltd. v. Douglas Public Service Corp., La.App., 75 So.2d 896. In that case, the defendant while passing another vehicle was confronted by an oncoming automobile and pulled to his left down an embankment and off the highway. When the automobile jammed on his brakes he was struck from the rear. The Court properly held that the accident was caused by the passing motorist even though that motorist had cleared the highway, when it held:
“We thoroughly agree that Drown was guilty of gross negligence and as thoroughly disagree that his action in leaving the highway, thereby clearing the traffic lane for the Studebaker, exonerated him from any negligence. Upon the admitted facts Drown was guilty of negligence and created an emergency, and when he left the highway he did not exonerate himself as the negligent act which was the proximate cause of the damage sustained by *268 the plaintiff’s vehicle had already been committed. The only result of his leaving the highway was that he exonerated himself from possible greater damage which would certainly have occurred had he run head on into the Studebaker.”
In their effort to prove Friedel was contributorily negligent, the defendants cited excerpts from various cases to the effect that a driver in the position Friedel was “should keep to his right path in the road and rely on the assumption which he has a right to malee that the other driver will get back to his side of the road before running into him,” quoting from Aguillard v. State, La.App., 7 So.2d 645. The authorities are inapposite; the principal point is made that it is not negligence for a driver to remain in his own lane. None of the cases establish a rule that it is negligence for the driver to attempt to minimize his injury by leaving the road to his right. One of the cases Bayou Tours, Inc., cites is Peeples v. Dobson, La.App., 99 So.2d 161, where a plaintiff faced with a similar situation left the road, yet recovered damages. In the present case, Friedel found himself in a position of imminent peril to which he had contributed in no way. Fie was faced with a choice between a head-on collision and leaving the road. Under such circumstances the choice he made was certainly a prudent one; even if not the better choice when measured by hind-sight it was not negligence on his part; Snodgrass v. Centanni, 229 La. 915, 87 So.2d 127. We conclude then that Friedel was not contribu-torily negligent; that T. Smith and Son, Inc., was not negligent and that the sole cause of this accident was the gross negligence of Bayou Tours, Inc.
Bayou Tours, Inc., and Marquette Casualty Company ask for a reduction in the quantum of the judgment. The evidence shows that decedent was 61 years of age and was earning a take-home pay of $6,260.10 per year; he and the plaintiff had enjoyed a happy married life for 29 years; he was an indulgent father and grandfather and lived for his family.
Our review of the entire record persuades us that the amount of the jury’s verdict cannot be justified on the evidence presented. While the verdict was in a lump sum, the only elements of damage were the widow’s financial and emotional losses, the pain and suffering of the deceased, and the funeral charges. The financial losses were determinable, on the basis of half of decedent’s $6,260.10 annual take-home pay, from expert actuarial testimony that decedent at age 61 had a life expectancy of from 13.47 to 16.9 years. The actuaries also gave present values of monthly incomes for those expectancy periods, discounted at rates of from three to five per cent per annum. Moreover, although decedent’s employer allowed its employees to work as long as they are able, it is doubtful that decedent could have continued to work for the whole period of his life expectancy. The financial loss being thus limited by the evidence in the record, we are satisfied that the total amount of $85,000.00 is manifestly excessive under the circumstances. Whether the jury erred in calculating the financial loss, or in allowing an excessive amount for the widow’s personal emotional loss or her husband’s few minutes of pain and suffering, we are unable to specify due to the lump sum verdict. However, we are constrained to hold that the total awarded is excessive and must be reduced to $65,000.00.
It is, therefore, ordered that there be judgment in this matter in favor of the plaintiff, Mrs. Theresa Bohlender, widow of August F. Friedel, Sr., and against the defendants, Bayou Tours, Inc., and Marquette Casualty Company, in solido, in the full sum of $65,000.00, together with legal interest thereon from date of judicial demand until paid and all costs of suit and that the verdict of the jury and the judgment of the court rendered herein be modified to this extent. It is further ordered, that in all other respects the verdict of the jury and the judgment of the district court is affirmed; it is further decreed that the *269 judgment rendered herein dismissing the suit of Bayou Tours, Inc., and Marquette Casualty Company against T. Smith and Son, Inc., is affirmed; it is further ordered that the judgment rendered herein in favor of Allied Mutual Fire Insurance Company and against Bayou Tours, Inc., and Marquette Casualty Company, in solido, in the sum of $635.00, together with legal interest thereon from date of judicial demand and all costs, and the judgment rendered in favor of Richards Center, Inc., against Bayou Tours, Inc., and Marquette Casualty Company, in solido, in the sum of $50.00, together with legal interest thereon from date of judicial demand and all costs is affirmed.
All costs of this proceeding shall be borne by defendants, Bayou Tours, Inc., and Marquette Casualty Company.
Amended and affirmed.
REGAN, J., concurs.