AYRES, Judge.
This is an action in tort wherein Claude E. Nichols, a 54-year-old lineman, an employee of L. E. Myers Company, seeks to recover damages for personal injuries, pain and suffering, loss of wages, and medical expenses arising out of an accident of September 15, 1967, when he was struck by a car driven by the defendant Mrs. Claudia P. Thompson while he was standing by the side of Flournoy-Lucas Road, south of Shreveport.
On the morning of the accident L. E. Myers Company was engaged in replacing poles of an electrical transmission line of Southwestern Electric Power Company immediately south of and parallel to the Flournoy-Lucas Road. Three vehicles were engaged in this work, the first a hole-digging truck, on the back of which was mounted a hydraulic digger, equipped with an A-frame which rested on top of and extended above the cab, operated by Earles H. Clark; the second, known as a “line truck,” a large van-type truck with trailer, operated by C. E. Winget; and the third, a “pole truck,” a tractor-trailer combination for transporting power-line poles, operated by Renard S. Henry.
The Flournoy-Lucas Road at the scene of this accident is of an asphalt or blacktop surface, 20 feet in width, running in a general east and west course. The shoulders are narrow, varying in width from two to four feet. When struck, plaintiff, Nichols, was standing near a pole located approximately 506 feet west of Stevens Road, which forms a T-intersection leading in a southerly direction from the Flour-noy-Lucas Road. The pole beside which plaintiff was standing was located 18 feet south of the road and in the middle of a double driveway leading to the residence of a Mrs. Stutts. The road, from the crest of a hill 550 feet east of the place of the accident, declines 17.7 feet in elevation to the accident scene. Prior to the occurrence, L. E. Myers Company had “changed out” sev *571 eral poles to the west. While the Myers crew was working, the trucks were parked partly on the shoulder and partly on the asphalt surface, blocking about five feet of the road.
The trucks were equipped with conical-shaped “MEN WORKING” signs which were ordinarily placed in front of and to the rear of the trucks. Signs were placed to the rear of the trucks when the first work was being done, some 700 or 800 feet west of the scene of the accident. No signs were placed east of the accident scene. As the work at a given location was completed, the trucks, with their crews, proceeded easterly and stopped to “change out” poles along the way. At the pole site immediately west of the accident scene the terrain was such that the pole-digging truck could not be utilized, whereupon two of the crew were left to dig that, hole by hand.
The three trucks then proceeded easterly at a normal walking pace with their right wheels on the shoulder and their left wheels on the blacktop. Nichols and Carl Ferguson, Myers’ foreman, walked from location to location, Nichols, on this occasion, immediately behind the hole-digging truck. This truck continued beyond the Stutts’ driveway a distance of 120 to 130 feet. The line truck, next in order, stopped west of the driveway. The third, or pole, truck eventually came to a stop behind the line truck. The latter two trucks may not have completely stopped at the time of the accident.
Mrs. Thompson, driving the family car westerly on the Flournoy-Lucas Road, was en route to a beauty salon. As she reached the top of the hill she saw the three Myers trucks down the hill alongside the road in the manner above described. Momentarily thereafter, she saw a white car, the driver of which is unknown, approaching or beginning a passing movement of the most westerly located Myers vehicle. Mrs. Thompson explained the occurrence thus:
“Well, as I came over the hill I saw three Southwestern Electric trucks parked in the eastbound lane three-fourths of the way in the .road. And even with the last truck in line, was a white car coming completely in my lane of traffic. As I traveled on down the hill he moved over to straddle the middle line. I put on my brakes and took to the shoulder. I passed the white car and immediately after passing the white car I saw a deep ditch on the right-hand shoulder which I was afraid I would fall into so I jerked my car back onto the road. * * * That is when I lost control of my car.”
It may be explained here that the record establishes that three-fourths of the highway surface was clear and unobstructed for traffic. Only one-fourth of its surface was occupied by the Myers vehicles.
The Thompson car, out of control, skidded across the road into the Stutts’ driveway, stuck Nichols, and continued its skidding maneuver, coming to rest on an embankment of the roadside ditch in front of the Stutts’ residence. No unusual weather or atmospheric conditions existed at the time other than perhaps a slight drizzle. Rain had fallen earlier in the day which left the roadway shoulders wet.
Made defendants are:
1. The Aetna Casualty & Surety Company. Aetna is the fleet liability insurer of L. E. Myers Company, and plaintiff claims that defendants Clark, Henry, and Winget are omnibus insureds under this policy. Aet-na is insurer of defendant Henry’s private automobile also.
2. State Farm Mutual Automobile Insurance Company, insurer of defendant Winget’s private automobile.
3. Firemen’s Insurance Company, insurer of defendant E. H. Clark’s private automobile.
*572 4. E. H. Clark, driver of the Myers digger truck.
5. C. E. Winget, driver of the Myers line truck.
6. Renard S. Henry, driver of' the Myers pole truck.
7. George L. Thompson, husband of Claudia P. Thompson, head of the community which owned the Thompson car.
8. Claudia P. Thompson, driver of the car which hit plaintiff.
The defendants Thompsons filed a third-party petition making Aetna and L. E. Myers Company third-party defendants under Aetna’s fleet liability policy insuring Myers, for the reason that L. E. Myers, through the action of its employees, was guilty of at least concurrent negligence contributing to the accident, and under another policy of Aetna insuring the defendants Thompsons. Aetna, it may be pointed out, was the workmen’s compensation insurer of Myers under still another policy.
Defendants State Farm, Aetna, and Firemen’s Fund filed motions for a summary judgment relative to plaintiff’s claims against them on a basis that the policies afforded no protection to the defendants. The motions were sustained and the insurers were dismissed from the suit.
This cause was subsequently tried on the merits of plaintiff’s claim against defendants Thompsons and Renard Henry, and on defendants Thompsons’ third-party demands against Aetna and Myers, and on confirmation of default on plaintiff’s action against C. E. Winget and E. H. Clark. After trial there was judgment in plaintiff’s favor against the defendants Thomp-sons in the principal sum of $35,000. Plaintiff’s claims against Clark, Henry, and Winget were rejected. Judgment was rendered in favor of defendants Thomp-sons on their third-party demand against Aetna in the amount of $10,000, the limit of Aetna’s policy insuring them. Third-party claims against Myers were rejected. Appeals from the judgment were taken by plaintiff and by defendants Thompsons and Aetna.
Of primary importance and concern is the question of liability vel non of Mrs. Thompson. Negligence charged against her were in these nonexclusive particulars: failure to keep a proper lookout, to maintain control of her car, to observe an obstruction in the highway in the nature of the presence of the Myers trucks, to reduce her speed or to stop, and in operating her vehicle at an excessive speed under the prevailing circumstances and weather conditions.
Mrs. Thompson was traveling at approximately 40 m.p.h. as she ascended the crest of the hill east of the scene of the accident. There were no warning signs or signals to indicate to her, as she ascended the hill, there were work crews or trucks located on the other side of the hill. However, as she came over the hill, she observed, for the first time, the three trucks in the positions heretofore described. She additionally observed a white vehicle, proceeding easterly, approaching or beginning to pass the Myers pole truck, the last of the three trucks in line. Startled by the scene Mrs. Thompson observed as she came over the hill, Mrs. Thompson applied her brakes, but, due to the distance between her and the oncoming car, she proceeded down the hill as that vehicle passed both pole and line trucks. Instead of then returning to its proper lane of travel in the space between the line truck and the pole-digger truck, for which there were both space and time for it to do so, the oncoming vehicle continued easterly, straddling the center line and therefore partially in Mrs. Thompson’s lane of travel. Thereupon, Mrs. Thompson began tapping her power brakes in an additional effort to further slow down and, at the same time, maneuvering her car to the right shoulder in an effort to avoid a head-on collision with the oncoming car continuing astride the center line of the road and partially in *573 her lane of travel. Through these efforts, Mrs. Thompson was able to meet and pass the oncoming vehicle which, at the time, was even in line with the forward, or pole-digger, truck.
Immediately following the related meeting and passing movement and before Mrs. Thompson had had an opportunity, through either time or distance, to maneuver her car off the shoulder and back onto the road, she observed the large ditch, approximately six feet in depth, beginning in the narrow shoulder of the road, whereupon, to avoid running into this ditch, she forcibly steered her car back onto the road at an approximate 45-degree angle, partially losing control as her car crossed the highway toward the front of the line truck. Thereupon, on observing the line truck directly in her path, Mrs. Thompson steered her car farther to the left in an attempt to reach the double driveway and to avoid striking the truck. On entering the double driveway, Mrs. Thompson was next confronted with three men standing in the vicinity, whereupon she again steered her vehicle sharply to the right to avoid striking them, but, on making this turn, her left front fender struck plaintiff, Nichols. Thereafter her vehicle continued several feet down a ditch in front of the Stutts’ residence, where it came to rest.
The trial court concluded, in effect, that Mrs. Thompson was confronted with an emergency when, at the top of the hill, she saw the three trucks parked to her left and the approach of the oncoming car. It was reasoned that she had ample opportunity to avoid the collision by timely reducing her speed.
The evidence, as heretofore pointed out, discloses that Mrs. Thompson saw the white car as it approached or began a passing movement of the two trucks west of the Stutts’ driveway. At that time, Mrs. Thompson indulged in the assumption, as she had a right to do, that the oncoming white vehicle would return to its proper lane which, as heretofore noted, it had time, space and opportunity to do.
It is a uniform, well-established rule of law that a motorist proceeding on the right side of a traveled highway may assume that the driver of an oncoming vehicle on the same side will return to its proper side of the road in time to avoid a collision and not force a driver proceeding in his proper lane to turn from that lane in which he is lawfully traveling. The duty of a driver in a proper lane to stop or take other evasive action to avoid a collision with an oncoming vehicle arises only when, by the exercise of due care, he discovers, or should discover, that the other vehicle cannot or will not return to its right and proper side of the road and thus yield the right of way. Martin v. Firemen’s Insurance Co. of Newark, N. J., 241 La. 1047, 132 So.2d 892 (1961); Parker v. Smith, 147 So.2d 407 (La.App., 2d Cir. 1962).
Therefore, Mrs. Thompson was justified in continuing down the hill until she realized, or should have realized, that the white car was not going to return to its proper lane of travel. It was only upon realizing that the oncoming car was going to pass the lead vehicle in her lane of travel that Mrs. Thompson was obliged to take evasive action by maneuvering her car to the right shoulder of the road. This she did. It is obvious that Mrs. Thompson exercised the correct choice and took proper evasive action, as a collision with the oncoming vehicle was averted. In this action she was guilty of no negligence.
When an operator of a motor vehicle is faced with a choice between a head-on collision and leaving the road, it is not negligence to take to the right shoulder. Bohlender v. Bayou Tours, Inc., 156 So.2d 255 (La.App., 4th Cir. 1963—cert. refused).
Thus, it was only when Mrs. Thompson realized the oncoming car would remain in her lane of travel, and not at the top of the hill, that she was confronted with a sudden emergency.
*574 This first emergency was followed by another equally serious sudden emergency in the existence of the deep ditch in the shoulder of the road into which, for Mrs. Thompson to prevent an almost certain serious accident, she had to avoid running her car. Apparently, the only alternative she had was to suddenly and'instinctively maneuver her vehicle back upon the roadway.
A rule is likewise well established in the jurisprudence that one, who suddenly finds himself in a position of imminent peril, through a sudden emergency not of his making or choosing, without sufficient time for reflection or to consider and weigh the facts and circumstances or the best means by which the impending danger may be avoided, is not required to exercise such control or degree of care and caution as is required of one who has ample time and opportunity for the exercise of reason and judgment; and if he fails to adopt what subsequently, upon reflection, may appear to have been a better method, he is not guilty of negligence. Dane v. Canal Insurance Company, 240 La. 1038, 126 So.2d 355 (1960); Snodgrass v. Centanni, 229 La. 915, 87 So.2d 127 (1956); Commercial Standard Insurance Company v. Johnson, 228 La. 273, 82 So.2d 8 (1955); Teche Lines v. Gorum, 202 La. 993, 13 So.2d 291 (1943); Wells v. Wright, 221 So.2d 612 (La.App., 2d Cir. 1969).
The court in the Teche Lines v. Gorum case, supra, in quoting from 5 Am.Jur. 600, § 171, verbo “Automobiles,” emphasized, as a universal rule of law, the statement:
“ ‘An automobile driver who, by the negligence of another and not by his own negligence, is suddenly placed in an emergency and compelled to act instantly to avoid a collision or injury is not guilty of negligence if he makes such a choice as a person of ordinary prudence placed in such a position might make, even though he did not make the wisest choice and one that would have been required in the exercise of ordinary care, but for the emergency.’ ” 13 So.2d 293.
The conclusion is therefore inescapable that Mrs. Thompson, under the circumstances of this case, while trying to avoid an apparent impending accident, was not negligent in losing control of her vehicle as she attempted to return from the shoulder to her proper lane of travel in the road. Smith v. Fidelity & Casualty Company of New York, 189 So.2d 110 (La.App., 1st Cir. 1966—writ refused).
A prime factor in the occurrence of the accident was the refusal or, at least, the failure of the unknown driver of the white car to return to his lane of travel, a maneuver, heretofore noted, Mrs. Thompson had a right to expect and to rely upon until she saw, or should have seen, he did not intend to do so. Upon realizing that driver was not going to return to his proper lane of travel, Mrs. Thompson acted wisely, moved her car to the right, partially on the narrow shoulder, and avoided a head-on collision.
No one contends that Mrs. Thompson should have sooner observed the ditch beginning in the shoulder to her right or that she should have sooner driven her car back onto the highway. Nor does anyone contend that this emergency was of her choosing or making, or that she, by her actions, contributed to it.
A painstaking review of the record fails to disclose any negligence on Mrs. Thompson’s part. There is no established basis for concluding she was guilty of actionable negligence in any of the particulars charged to her, such as a failure to keep a proper lookout, to observe the trucks and oncoming car promptly or to reduce her speed. She made proper observation of traffic conditions, the parked trucks and the oncoming car. Her speed as she came over the hill was within the statutory limits and not excessive under the circumstances and weather conditions then prevailing.
*575 Next for consideration is a question of negligence vel non of Clark, Henry, and Winget, drivers of the three Myers trucks. Negligence directed to them consists of obstructing the roadway by parking or bringing their vehicles to an almost stopped position partially on the highway and thus creating a barrier across a portion of the eastbound traffic lane, and in failing to erect adequate warning signs to inform traffic of a hazardous condition.
Appropriate to these charges are provisions of the Highway Regulatory Act, LSA-R.S. 32:141 and 32:369. The first of these, so far as is pertinent to the issues here, provides:
“A. Upon any highway outside of a business or residence district, no person shall stop, park, or leave standing any vehicle, whether attended or unattended, upon the paved or main traveled part of the highway when it is practicable to stop, park or so leave such vehicle off such part of said highway, but in every event an unobstructed width of the highway opposite a standing vehicle shall be left for the free passage of other vehicles and a clear view of such stopped vehicles shall be available from a distance of two hundred feet in each direction upon such highway.”
The second of these sections requires that:
“Between sunrise and sunset, buses, cars for hire having a capacity for over ten passengers, cars or trucks used as wreckers or for other towing purposes, freight carrying vehicles and combinations thereof, shall be equipped with two red flags, one to be placed 100 feet behind and the other 100 feet ahead of said parked vehicles and in such a position as to be visible to all approaching traffic during the daylight hours.”
These sections of the statute were designed to protect life and property on the highway. They are safety measures and their violation is negligence per se, and this negligence is actionable if it is a legal cause of a collision. Dixie Drive It Yourself System New Orleans Co. v. American Beverage Co., 242 La. 471, 137 So.2d 298, 302 (1962).
Thus it was said, in the cited case, that:
“Negligent conduct is a cause-in-fact of harm to another if it was a substantial factor in bringing about that harm. * * * the negligent conduct is undoubtedly a substantial factor in bringing about the collision if the collision would not have occurred without it. A cause-in-fact is a necessary antecedent.”
Therefore, we may add that, if the collision would have occurred irrespective of the negligence of the drivers of the trucks, then their negligence was not a substantial factor or cause-in-fact. In the above-quoted language, the court was commenting upon a prior statute, LSA-R.S. 32:241 and 32:442, predecessors of the present sections of the Highway Regulatory Act.
In the Dixie Drive It Yourself System case, supra, a truck stalled and was blocking one lane of traffic on a 4-lane divided highway. No flags were placed in compliance with the statute. A following truck ran into the parked truck. The court concluded that the operator of the blocking truck violated the regulatory act in at least two particulars: first, by failing to leave a 15-foot passageway clear (the present statute omits any specific width which must remain open for traffic) and, second, by failing to place flags so as to be visible to all approaching traffic during daylight hours. The purpose and function of the flags or other warning signals were to give notice of the presence of the vehicle or vehicles parked on the highway and to serve as a warning of possible danger.
In the instant case, Mrs. Thompson saw the trucks stopped or parked partially on and partially off the highway as she came over the crest of the hill, and, at the same time or soon thereafter, she saw the oncoming white vehicle approaching, or in a manner passing, the two latter trucks. The *576 erection and placement of flags or other warning devices were therefore unnecessary and would not have given Mrs. Thompson greater notice or better warning of the hazard because, on coming into view, she actually saw the partial obstructions in the roadway and realized the danger.
Therefore, the negligence with which these truck drivers are charged is not a cause in fact of the accident, nor did it contribute thereto, and hence is not actionable.
Under the evidence contained in the record of this case and as heretofore noted, the action of the driver of the unknown car, in driving upon his left, or wrong, side of the roadway and failing to return to his proper traffic lane, was a substantial factor in precipitating the occurrence and constituted a proximate cause of the accident. His acts constituted an effective intervening cause of the accident and he, in our opinion, was solely responsible for the occurrence.
In view of the conclusions reached with respect to the negligence charged to the defendants, consideration of the question of their insurance coverage may be properly pretermitted.
For the reasons assigned, the judgment appealed is annulled, avoided, reversed, and set aside; and
It is now ordered, adjudged, and decreed that plaintiff-appellant’s demands be, and they are hereby, rejected and his suit dismissed at his cost.
Reversed.
SUPPLEMENTAL OPINION
PRICE, Judge.
After further study and evaluation of the evidence contained in the record of this case, we have concluded that we were in error in applying the sudden emergency doctrine to absolve Mrs. Claudia Thompson from fault under the facts of this case.
The evidence shows that as Mrs. Thompson drove her late model Oldsmobile sedan over the crest of the hill just east of the scene of this accident, she saw, or should have seen, a potential danger developing. The blacktop surface of the road was only 20 feet in width and the grassy shoulder on her right varied in width from two to three feet. . A ditch runs adjacent to and parallel with the right shoulder of the road proceeding westerly. This ditch begins at the crest of the hill with a depth of slightly over two feet and gradually deepens toward the scene of this accident to a depth of over seven feet. The surface of the road was wet from rain which had fallen earlier that day. At the time of first sighting the oncoming car beginning to pass the furthermost truck, Mrs. Thompson was over 600 feet from the car and was approximately 550 feet from the accident scene. The evidence reflects her automobile traveled over 400 feet to reach the point where it passed the oncoming car approximately abreast of the pole digger truck.
Assuming her speed at the time she reached the crest of the hill was 40 miles per hour as testified by her, she could have brought the vehicle to a complete stop within 250 feet, according to any recognized stopping chart. (Actual stopping distance for the speed varies from 126 to 178 in charts reproduced in Am.Jur.2d Desk Book, pages 453-456.
Although the testimony of Mrs. Thompson vascillates somewhat as to the precise action she took after sighting the danger in her path, it is clear that she did not make a constant application of the brakes of her vehicle which would have reduced its speed sufficiently to have allowed her to cope with any contingency which might be expected to develop from the hazardous situation confronting her. By “constant application of brakes” we do not intend to imply a sudden application of *577 brakes, which might result in a locking of brakes and induce skidding or sliding of the vehicle. We use the term “constant application” as opposed to the intermittent “tapping of brakes” as described by Mrs. Thompson in her testimony.
By not having exerted this degree of precaution Mrs. Thompson allowed her vehicle to approach the climax of this inherently dangerous situation at too great a speed, causing her to lose control of her vehicle at the crucial time, resulting in the unfortunate injury to plaintiff herein.
In our original opinion we justified Mrs. Thompson’s failure to slow down immediately on sighting the automobile in her lane of traffic on the jurisprudential doctrine that a motorist seeing another vehicle approaching in his lane of traffic may assume that the motorist will return his vehicle to the proper lane to avoid a collision. We do not now believe this doctrine appropriate to the facts of this case. Mrs. Thompson at no time testified she was under this impression.
This rule of law is discussed in Blash-field’s Cyclopedia of Automobile Law and Practice, Vol. 2, Permanent Edition, Section 919, as follows:
“A motorist has a right to assume that the driver of a vehicle coming from the opposite direction will obey the law, and to act upon such assumption in determining his own manner of using the road. A driver, therefore, proceeding on the right side of the traveled way, may assume that the driver of a vehicle approaching on the same side, or on his left-hand side, will do all that a reasonably prudent person, under all the circumstances, would do to avoid a collision, which ordinarily would be to yield half the way, or to turn out in -time to avoid a collision, and that such driver will not force him, in violation of the statute or ordinance, or the law of the road, to turn from the part of the road on which he is lawfully driving.
“Likewise, a motorist on the right side of the road and traveling in a lawful manner can assume that one approaching in the opposite direction will control his car in obedience to the law of the road and will not suddenly turn across his path.
“These assumptions may not be indulged in, however, after he sees or ought to see, from the situation of the cars or highway or the conduct of the approaching driver, that they are unwarranted. In other words, the duty of an automobile driver, who is on the right side of the street, to stop or take other precautions to avoid a collision with an approaching vehicle, only arises when by due care he discovers that another on the wrong side of the street cannot or will not himself turn to the right to clear his way.” (Emphasis supplied.)
It should have been apparent to Mrs. Thompson as she crested the hill and first observed the oncoming white automobile that the driver had committed himself to passing the line of trucks impeding the south lane of traffic and that the vehicle would not be able to entirely return to its proper lane of traffic prior to meeting her vehicle at the speed each was then traveling.
In the case of Robert v. Travelers Indemnity Company, (La.App., 1st Cir., 1967), 196 So.2d 657, the court described the limitations of the application of the sudden emergency doctrine as follows:
“The doctrine of sudden emergency can be explained thusly: When one finds himself in a position of imminent peril without sufficient time to consider and weigh all the measures which might be taken to avoid an accident, he is not guilty of negligence if he fails to adopt what later appears to have been the best method, unless the emergency in which he finds himself is brought about by his own negligence. Before a motorist can take advantage of the sudden emergen *578 cy doctrine, it must be found that the emergency was not brought about or contributed to by the motorist.” (p. 660)
We believe Mrs. Thompson had sufficient time to weigh and consider what measures should have been taken for her safety and she chose a course of action which thereafter contributed to the emergency which resulted.
The trial judge, in finding Mrs. Thompson was guilty of negligence, applied the rule that a motorist who has an accident outside of his proper lane of travel must bear the burden of absolving himself from negligence to avoid liability. We are of the opinion there is no manifest error in the finding of the trial judge that Mrs. Thompson was guilty of negligence which was a proximate cause of the accidental injury to plaintiff.
We adhere to the result reached in our original opinion in affirming the trial judge’s conclusion that the employees of L. E. Myers Company were not guilty of actionable negligence which caused this injury to their co-worker.
If the failure to exercise proper warning devices was a cause in fact of the injury to plaintiff, the blame for this failure can no more be attributed to his three fellow workers, Clark, Wingert and Henry, than to the plaintiff himself. The evidence shows that he had as much responsibility and authority for placing adequate warning devices as anyone other than the foreman, Ferguson.
It may well be that the employer, L. E. Myers Company, was guilty of negligence in not providing a more suitable warning method, such as flagmen, in this type of undertaking. However, any negligence of the employer will be of no comfort to the plaintiff because the provisions of the Workmen’s Compensation Act relieve the employer of tort liability where coverage is afforded under the act.
The third party demand of Mr. and Mrs. Thompson is directed solely at the Myers Company and did not include as defendants the individual truck drivers.
There can be no action for contribution against Myers as a joint tort feasor as the law on the question is apparently settled by the case of McLaughlin v. Braswell (La.App.1968), 207 So.2d 158, in which the Fourth Circuit held as follows:
“ * * * an employer cannot be called upon for contribution toward the payment of damages suffered by the employee even where the injuries of the employee resulted from the negligence on the part of the employer and a third party.”
The Supreme Court refused to grant writs in this case, finding no error of law committed by the appellate court.
We do not, therefore, find it appropriate to rule on the negligence of the defendant, Myers, separate and apart from its employees, as no benefit can accrue to either the plaintiff in the primary demand nor the third party plaintiff’s from this defendant.
The trial judge awarded plaintiff a total judgment for the sum of $35,000.00. In his reasons for judgment the judge declared he had minimized the amount awarded as the limits of the liability insurance coverage on the Thompson vehicle was $10,000.00. He thus concluded a limited ability to respond in damages by the Thompsons on this basis alone. No other evidence was introduced seeking to prove financial inability on their part. Under Smith v. Freeman, (La.App., 2d Cir. 1947), 31 So.2d 524, the court should only mitigate damages where an inability to pay is sufficiently proven.
As the record does not contain any proof of an inability other than the lack of sufficient liability insurance coverage carried by the Thompson defendants, we are of the opinion equity would require us *579 to remand the case to allow evidence to be presented on this question.
IT IS THEREFORE ORDERED that the judgment appealed from be set aside and that this cause be remanded to the First Judicial District Court for further proceedings in accordance with law and not inconsistent with the views expressed herein.
Costs of this appeal are assessed against appellants, George L. and Claudia P. Thompson, and Aetna Casualty and Surety Company. Assessment of all other costs are to await final determination of this cause.